IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| STELLA REEVES, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. 23-2017-BAH |
| MARYLAND DEPARTMENT OF TRANSPORTATION, MOTOR VEHICLE ADMINISTRATION, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Stella Reeves ("Plaintiff") brought suit against her former employer, the Motor Vehicle Administration ("MVA" or "Defendant") of the Maryland Department of Transportation ("MDOT"), alleging retaliation under the Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA") and Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"), as well as intentional infliction of emotional distress. ECF 3. Pending before the Court is Defendant's motion to dismiss. ECF 17. Plaintiff filed an opposition, ECF 18, and Defendant filed a reply, ECF 19. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's motion to dismiss, ECF 17, is **GRANTED in part and DENIED in part**.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

I.    **BACKGROUND**

Plaintiff began working for Defendant on probationary status in November 2022 as a "Customer Agent."[2] ECF 3, at 2 ¶¶ 9–10, 8 ¶ 51. In this role, Plaintiff staffed the "Self Service Kiosk" at the MVA branch in Largo, Maryland, which also served as the first point of contact for customers entering the branch. *Id.* at 3 ¶ 18. At the beginning of her time at the MVA, multiple employees were stationed at the Self-Service Kiosk at a time. *Id.* at 3 ¶ 18, 4 ¶ 28. Plaintiff had a pre-existing injury to her ankle and legs which made walking and standing for long periods of time difficult. *Id.* at 4 ¶ 27.

In mid-December 2022, a visibly upset African American man approached Plaintiff, who is herself an African American woman, at the Self-Service Kiosk. ECF 3, at 2 ¶ 11, 3 ¶ 19. The man cried as he told Plaintiff that one of Plaintiff's white coworkers had belittled him and referred to him using offensive language, including racial slurs, during a previous visit to the MVA. *Id.* at 3 ¶ 20. The man then opened his coat and showed Plaintiff a gun he had on his person, saying something to the effect of "that his plan was to 'make sure [Plaintiff's coworker] never speaks to another human being in such a despicable and deplorable manner again.'" *Id.* at 4 ¶¶ 20–21. Plaintiff successfully deescalated the situation, and the man left without incident. *Id.* at ¶ 24.

Plaintiff reported the incident with the gun-toting man to the branch manager, a white man, including details about what the man had claimed was said to him and which employee he identified as having offended him. ECF 3, at 3 ¶ 14, 4 ¶¶ 25–26. A week after this report, Plaintiff's coworkers at the MVA began "to spread rumors about her that she was a 'snitch.'" *Id.* at ¶ 26.

---

[2] The facts in this section are taken entirely from Plaintiff's corrected complaint, ECF 3.

In early January 2023, after Plaintiff reported the incident with the man and the gun, the assistant branch manager adjusted the staffing assignments at the Self-Service Kiosk, leaving Plaintiff as the sole employee at the station. ECF 3, at 5 ¶ 29. Following this staffing change, Plaintiff complained repeatedly to both the branch manager and the assistant branch manager that, now that she was the only staff member assigned to the Self-Service Kiosk, the high volume of customers at the kiosk prevented her from being able to sit down during her shift, and this continued strain on her leg and ankle was aggravating her pre-existing injuries and leading to further damage. *Id.* at ¶ 31. The manager and assistant manager did not assign additional staff to the kiosk. *Id.* at ¶ 32. Plaintiff's injuries worsened, and she "began to walk with a visible limp" and ultimately started using a cane. *Id.* at ¶¶ 33–35.

In late February 2023, Plaintiff wrote to the MDOT MVA Office of Civil Rights and Fair Practices ("MVA OCRFP"), complaining of "bullying and harassment" from her coworkers as well as reporting her concerns over her worsening leg and ankle pain. ECF 3, at 6 ¶ 37. She also filed an MVA "Employee Report of Accident/Personal Injury" relating to her leg and ankle pain in February. *Id.* at ¶ 38. On March 1, 2023, Plaintiff reported her concerns over her injuries and bullying to MVA's EEO Officer and Human Resources staff at the MVA headquarters. *Id.* at ¶ 40. As part of this report, Plaintiff requested an accommodation from the MVA "related to her ankle and leg" on March 1, 2023, and the MVA granted her request on March 2, 2023.[3] *Id.* at ¶ 40.

Plaintiff sought medical treatment on March 13, 2023, due to "atypical chest pain, suicidal ideation, and stress disorder." *Id.* at 7 ¶ 43. Her "chest pain was attributed to stress" and she

---

[3] It is unclear what this request entailed, as Plaintiff provides no details on the substance of the request. *See* ECF 3, at 6 ¶¶ 40–41.

reported weeks of symptoms of depression at an emergency psychiatric consult. *Id.* at ¶¶ 43–44. The medical center provided her a letter documenting that she was treated, which Plaintiff provided to Defendant. *Id.* at ¶ 45.

On March 17, 2023, Plaintiff again wrote a letter to MVA OCRFP documenting her concerns over the alleged bullying and alleging that she was receiving insufficient training. ECF 3, at 7 ¶ 46. Just three days later, MVA OCRFP held a meeting about Plaintiff's concerns at which the director of OCRFP, the MVA's EEO officer, the district manager of Plaintiff's district, and Plaintiff's branch manager and assistant branch manager were all present.[4] *Id.* at ¶ 47. Three days after that meeting, less than a week after Plaintiff's most recent MVA OCRFP complaint, Plaintiff submitted a "Complaint of Workplace Bullying" to the MVA on March 23, 2023. *Id.* at ¶ 48. On May 16, 2023, the director of the MVA OCRFP sent a letter to Plaintiff that "described the March 20, 2023 meeting" and informed Plaintiff that the MVA OCRFP had taken "appropriate action as needed" regarding Plaintiff's complaints of bullying. *Id.* at 10 ¶ 64.

On March 24, 2023, Plaintiff's supervisor prepared an "Employee Development Plan" for Plaintiff. ECF 3, at 7 ¶ 49. That same day, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* at ¶ 50. Plaintiff ultimately received a right-to-sue letter relating to this charge dated April 28, 2023. *Id.* at 2 ¶ 5. On April 11, 2023, Defendant held a "probation review" with Plaintiff where Plaintiff was given an evaluation that indicated that she had "met standards and qualifications in all categories evaluated" but that her probationary period was being extended to November 14, 2023, for "Additional Training." ECF 3, at 8 ¶¶ 51–52.

---

[4] It is unclear what came of this meeting; the complaint only states that it happened. ECF 3, at 7 ¶ 47.

On April 20, Plaintiff mistakenly "allowed a customer who was not qualified for a license to enter the driving test room." ECF 3, at 8 ¶ 54. Five days later, the MVA conducted an "Investigatory Interview" with Plaintiff regarding her mistake on April 20, followed by a "Discipline Decision Meeting" the next day, April 26, 2023. *Id.* at 8–9, ¶¶ 56–58. Ultimately, the MVA decided that no disciplinary action should be taken regarding Plaintiff's mistake. *Id.* at ¶ 59.

During roughly this same time period, Plaintiff had a conversation with one of her coworkers where the coworker invited Plaintiff to an adult entertainment establishmentand asked for Plaintiff's phone number. ECF 3, at 8 ¶ 55. Plaintiff declined the invitation and explained "that the invitation made her uncomfortable" and that "she did not trust coworkers with her personal phone number." *Id.* On April 26, 2023, the same day as Plaintiff's "Discipline Decision Meeting" regarding her mistake with the customer and the driving test room, Defendant held an "Investigatory Interview" with Plaintiff regarding her conversation with her coworker. *Id.* at ¶ 61. When Plaintiff was notified of the "Investigatory Interview," she was told that she had "made a coworker feel uncomfortable at work by stating '[that she] was told [she] couldn't trust [the coworker].'" *Id.* During the Investigatory Interview, Plaintiff explained to her supervisor the context of her conversation with her coworker. *Id.* at ¶ 62. Ultimately, the MVA decided that no disciplinary action was warranted towards Plaintiff regarding the conversation with her coworker. *Id.* at ¶ 65.

On May 26, 2023, the MVA notified Plaintiff that she would be discharged from her employment on June 9, 2023. ECF 3, at 10 ¶ 66. The MVA also issued Plaintiff a "Notice of Disqualification from Future Employment," which barred her from employment with MDOT and the MVA for the next five years. *Id.* at ¶ 67. Plaintiff filed a grievance related to her termination

5

with the assistance of her union representative on June 2, and submitted a "Disciplinary Action Appeal Form" challenging her disqualification from future employment with MDOT on June 5, again with the assistance of the union. *Id.* at ¶ 69. Also on June 5, 2023, Plaintiff visited the Emergency Room and was diagnosed with "acute chest pain" and "acute stress reaction." *Id.* at 10–11 ¶ 70. On June 21, 2023, Plaintiff filed an additional EEOC Charge of Discrimination detailing additional allegations of retaliation and discrimination that had occurred since the filing of her initial EEOC charge. *Id.* at 11 ¶ 71.

Plaintiff filed this lawsuit on July 26, 2023, less than 90 days after she received her EEOC right-to-sue letter dated April 28, 2023. ECF 1; ECF 3, at 2 ¶ 6. Plaintiff subsequently filed the operative "corrected" complaint. ECF 3. Plaintiff brings three counts against Defendant: retaliation in violation of Title I of the ADA, retaliation in violation of Title VII, and intentional infliction of emotional distress. ECF 3, at 11–16 ¶¶ 72–109. Defendant now moves to dismiss the corrected complaint under Federal Rules of Civil Procedure 12(b)(1) and 12 (b)(6). ECF 17-1, at 4–14.

## II.     LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a complaint for a lack of subject matter jurisdiction. "Rule 12(b)(1) governs motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction." *Stone v. Trump*, 400 F. Supp. 3d 317, 333 (D. Md. 2019); *see also Pruitt v. Resurgent Cap. Servs., LP*, 610 F. Supp. 3d 775, 779 (D. Md. 2022) (explaining that motions to dismiss for lack of standing are considered under Rule 12(b)(1)). "Motions to dismiss for lack of subject matter jurisdiction are properly granted where a claim fails to allege facts upon which the court may base jurisdiction." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005) (citing *Crosten v. Kamauf*, 932 F. Supp. 676, 679 (D. Md. 1996)).

The Plaintiff bears the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). Subject matter jurisdiction is a threshold inquiry for suit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998). When a defendant challenges subject matter jurisdiction, the Court "is to regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co.*, 945 F.2d 765, 768 (4th Cir. 1991)); *see also Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

In evaluating a motion to dismiss, "the Court may consider only such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference." *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 450 (D. Md. 2019) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, (2007)). "To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'" *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting *Helprin v. Harcourt, Inc.*, 277 F.Supp.2d 327, 330–31 (S.D.N.Y.2003)). Here, the Court considers Plaintiff's March 2023 EEOC charge, attached to Plaintiff's opposition to Defendant's motion to dismiss, as it was explicitly referenced in Plaintiff's corrected complaint and is essential to Plaintiff's case. *See* ECF 18-1, at 3 (showing March 24, 2023, EEOC charge); ECF 3, at 3 ¶ 4 ("Plaintiff filed a timely charge of retaliation with the Equal Employment Opportunity Commission (EEOC))."); *id.* at 7 ¶ 50 ("On March 24, 2023, Reeves (acting pro se) filed a Charge of Discrimination with the EEOC (Charge No. 531–2023-02443) which led to the instant Complaint."); *see also Hill v. Jamestown-Yorktown Found.*, Civ. No. 18-137, 2019 WL 3084242, at *2 n.2 (E.D. Va. July 15, 2019) ("[A]lthough they were not attached to the Amended Complaint, the Court finds it appropriate to consider the EEOC charges attached to the parties' briefing because the charges were incorporated by reference in the Amended Complaint, and are 'integral to the administrative history of a subsequent civil discrimination complaint'" (citation omitted)); *Crew v. Nature's Variety, Inc.*, Civ. No. 22-00380, 2022 WL 4234266 (W.D. Va. Sept. 14, 2022) ("[The plaintiff] expressly references his EEOC charge in the complaint by alleging that he filed an EEOC charge and was issued a Notice of Right to Sue." (citation omitted)).

III.  **ANALYSIS**

Defendant argues that counts one (retaliation in violation of the ADA) and three (intentional infliction of emotional distress) should be dismissed because both are barred by the State of Maryland's sovereign immunity under the Eleventh Amendment, ECF 17-1, at 4–5, 10–12, and that count two (retaliation in violation of Title VII) should be dismissed for failure to exhaust administrative remedies or, alternatively, for failure to state a claim, *id.* at 5–10. Plaintiff concedes to the dismissal of count one but argues that both counts two and three are viable. ECF 18, at 1–24. For the reasons explained below, counts one and three will be dismissed, but count two will survive.

A.  **Count one is dismissed.**

Defendant has moved for the dismissal of count one, ECF 17; ECF 17-1, at 4–5, and "Plaintiff concedes to the dismissal of Count I (Retaliation in Violation of Title I of the Americans with Disabilities Act)," ECF 18, at 1. As such, count one, retaliation in violation of the ADA, is dismissed without prejudice.

B.  **Count two survives Defendant's motion to dismiss.**

Defendant raises two arguments relating to Plaintiff's Title VII retaliation charge. ECF 17, at 5–10. First, Defendant asserts that this claim was not administratively exhausted. *Id.* at 5–7. Plaintiff bases her Title VII retaliation claim on Defendant "terminating her employment and barring her from future employment" as well as "the disciplinary actions against Plaintiff." ECF 3, at 13 ¶¶ 86–87. Defendant claims that Plaintiff's first EEOC charge, for which she received a right-to-sue letter, does not encompass these allegations, and, as such, Plaintiff has not exhausted administrative remedies as required before filing this suit. ECF 17-1, at 5–7. Plaintiff counters that the allegations in the complaint are sufficiently related to the allegations in the original EEOC charge so as to meet the exhaustion requirements of Title VII. ECF 18, at 7–8. Defendant next

argues that, even if the Title VII count is properly before the Court, the complaint fails to state a claim. ECF 17, at 7–10.

1. *Plaintiff has pled that her Title VII claim is administratively exhausted.*

An employee must exhaust administrative remedies by filing an EEOC charge before filing a civil action in federal court.[5] *Sawyers v. United Parcel Service*, 946 F. Supp. 2d 432, 438 (D. Md. 2013). Generally, a court is not "at liberty to read into administrative charges allegations they do not contain." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013). As such, the "factual allegations made in the formal litigation must correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005). A claim will typically be barred where the complaint alleges new bases of discrimination. *See Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (declining to consider sex and color discrimination claims where the EEOC charge only alleged race discrimination); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) (holding plaintiff's federal claims of sexual harassment and claims of discrimination in pay or benefits were barred when the EEOC charge only contained an allegation of denial of promotion on the basis of sex). "At the same time, however, lawyers do not typically complete the administrative charges, and so courts construe them liberally." *Chacko*, 429 F.3d at 509; *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 594 (4th Cir. 2012) ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs.");

---

[5] In *Fort Bend County, Texas v. Davis*, the Supreme Court clarified that failure to exhaust administrative remedies during the EEOC process does not affect the Court's jurisdiction over a Title VII claim. 139 S. Ct. at 1850. Rather, Title VII's requirement to exhaust administrative remedies is a prerequisite to filing suit in this Court. *See id.* at 1851. ("Title VII's charge-filing requirement is a processing rule, albeit a mandatory one . . . ."). "The Court possesses subject-matter jurisdiction to consider discrimination claims that have been brought under Title VII, even if those claims have not been properly raised during the EEOC process." *Knott v. McDonalds Corp.*, Civ. No. 21-00592-LKG, 2021 WL 5015750, at *5 (D. Md. Oct. 28, 2021) (citing *Fort Bend Cnty.*, 139 S. Ct. at 1850). Thus, the Court considers Defendant's motion to dismiss with respect to count two only under the Rule 12(b)(6) standard.

*Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981) ("An administrative charge of discrimination does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.").

The Fourth Circuit has sought to "to strike a balance between providing notice to employers and the EEOC on the one hand and ensuring plaintiffs are not tripped up over technicalities on the other." *Syndor*, 681 F.3d at 594. Accordingly, seeking to ensure employers are on notice, the Fourth Circuit has held that where the EEOC charge references "different time frames, actors, and discriminatory conduct than the central factual allegations in [a plaintiff's] formal suit," the plaintiff's new claims will be considered unexhausted. *Chacko*, 429 F.3d at 506; *see also Thiessen v. Stewart-Haas Racing, LLC*, 311 F. Supp. 3d 739, 744 (M.D.N.C. 2018) (holding that a plaintiff's failure to accommodate, promote, and retaliation claims were not "reasonably related" to his wrongful termination claim because the new claims involved different time frames, actors, and discriminatory conduct). But, in seeking to prevent plaintiffs from being "tripped up" over technicalities, the Fourth Circuit has found claims that are sufficiently similar to the claims in the EEOC charge to be exhausted in some circumstances. For instance, the Fourth Circuit "found exhaustion [in a case] where both the administrative complaint and formal litigation concerned 'discriminat[ion] in promotions' but involved different aspects of the 'promotional system.'" *Snydor*, 681 F.3d at 594 (quoting *Chisholm*, 665 F.2d at 491). Additionally, the Fourth Circuit has found exhaustion "where both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct." *Id.* (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 248 (4th Cir. 2000)).

Here, Plaintiff's corrected complaint makes clear that she filed two separate EEOC charges: a first on March 24, 2023, "which led to the instant Complaint," and a second on June 21, 2023. ECF 3, at 7 ¶ 50, 11 ¶ 71. The corrected complaint also states that Plaintiff received a right-to-sue letter on April 28, 2023. *Id.* at 2 ¶ 6. Though the complaint does not explicitly state that this right-to-sue letter stemmed from the March EEOC charge, it can only relate to that initial charge, as it was issued prior to the filing of the June 2023 EEOC charge. The complaint does not state that Plaintiff was issued a right-to-sue letter for the June 2023 EEOC charge. *See id.* at 11 ¶ 71 (stating only that a second EEOC charge was filed).

Plaintiff filed this suit within 90 days of the issuance of the right-to-sue letter for her first EEOC charge, ECF 3, at 2 ¶ 6, and so whether she has administratively exhausted the Title VII claim brought as count two of her corrected complaint turns on whether the "factual allegations made in the formal litigation [] correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).

The March 2023 EEOC charge alleges retaliation based on the alleged bullying Plaintiff suffered from her coworkers as well as the understaffing at the Self-Service Kiosk and an alleged lack of training.[6] ECF 18-1, at 3. None of these actions form the basis for count two of Plaintiff's

---

[6] While Plaintiff's writing is very neat, it is nonetheless difficult to read her handwritten EEOC charge. As best the Court can discern, the factual allegations she submitted as part of her EEOC charge read as follows:

> Because I was forced to report a serious incident against my fellow teammates, I have been retaliated against by being forced to do a job that requires 2 to 3 employee members and have been purposely denied the training needed to continue my position, falsely accused of serious incidents, and purposely set up in entrapment of errors that could cause me to lose my job. Totally disrespected and ignored when I need help in assisting my customer and accused of forcing my customer to submit compliments about me, and much more.

ECF 18-1, at 3 (minor grammar and spelling corrections).

12

corrected complaint before this Court, which is based on Defendant's termination of Plaintiff and disciplinary investigations against her. ECF 3, at 13 ¶¶ 86–87. Despite this disconnect, though, the allegations in Plaintiff's complaint could be "reasonably expected" to be uncovered "by the scope of [an] administrative investigation" based upon her first EEOC charge. *Chisholm,* 665 F.2d at 491. The disciplinary actions upon which Plaintiff bases her Title VII claim occurred shortly after the filing of her March EEOC charge, with the disciplinary inquiries occurring at the end of April, and Plaintiff receiving notification of her discharge at the end of May. ECF 3, at 8–9, ¶¶ 54–62, 10 ¶ 66. The March EEOC charge alludes to retaliatory conduct by Plaintiff's supervisors and the leadership of the MVA in the assignment of staff to the Self-Service Kiosk as well as the lack of training provided to Plaintiff, and Plaintiff's supervisors and the MVA branch leadership are also the primary actors in Plaintiff's description of her disciplinary proceedings and the decision to terminate her employment. *See* ECF 18-1, at 3; ECF 3, at 8–9, ¶¶ 54–62, 10 ¶ 66. And though Plaintiff does not reference her actual termination or the specific disciplinary proceedings brought against her in her March EEOC charge, she mentions both being "falsely accused of serious incidents" and a fear that such false accusations could "cause [her] to lose [her] job." ECF 18-1, at 3. Thus, the Court is satisfied that Plaintiff has successfully pled administrative exhaustion because the allegations in her claim are "reasonably related" to those in her EEOC charge. *See Chacko*, 429 F.3d at 506 (identifying similar "time frames, actors, and discriminatory conduct" as key to evaluating whether a claim is "reasonably related" to an EEOC charge).

2. *Plaintiff has successfully stated a claim for retaliation in violation of Title VII.*

The Court next considers whether the factual allegations in the complaint are sufficient to state a claim for retaliation under Title VII. Title VII of the Civil Rights Act prohibits status-based discrimination based on an employee's personal characteristics such as "race, color, religion, sex,

13

or national origin." 42 U.S.C. § 2000e–2(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013); *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018). "Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participating in a Title VII investigation or proceeding." *Angelini*, 464 F. Supp. 3d at 776 (citing 42 U.S.C. § 2000e–3). An employer retaliates against an employee in violation of Title VII when the employer takes an adverse employment action against the employee because of the employee's participation in a Title VII action. *Id.* at 776–77.

Though a plaintiff need not establish a prima facie case at the motion to dismiss stage, "reference to the elements of a claim is helpful to assess whether the plaintiff has stated a plausible claim." *Allgaier v. Microbiologics, Inc.*, Civ. No. 22-01900-ELH, 2023 WL 2837336, at *8 (D. Md. Apr. 7, 2023). A plaintiff must satisfy three elements to establish a prima facie retaliation case: "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005). Participation in a Title VII process constitutes protected activity when the person allegedly facing retaliation "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). Here, Plaintiff participated in numerous protected activities over the course of several months, from filing internal complaints with her MVA branch, ECF 3, at 63 ¶ 14, 6 ¶ 38, to contacting the MVA OCRFP, *id.* at 6 ¶ 37, 7 ¶ 46, to filing an EEOC charge, *id.* at 7 ¶ 50. Thus, Plaintiff has easily pled sufficient facts to establish the first element of a prima facie case of retaliation.

A successful retaliation claim must next plead that the plaintiff suffered an adverse action. *Angelini*, 464 F. Supp. 3d at 776–77. To qualify as a materially adverse action in the retaliation

context, the adverse action must be of the type that "might have dissuaded a reasonable worker" from engaging in protected activity. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Strothers*, 895 F.3d at 327. Termination is a quintessential example of an adverse employment action. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (identifying "termination, failure to promote, denial of transfer, [and] refusal to hire" as adverse employment actions). Here, the Court need not consider whether the disciplinary investigations and proceedings allegedly initiated against Plaintiff constitute adverse actions, because Plaintiff's ultimate termination suffices to satisfy this requirement. ECF 3, at 10 ¶ 66.

The third element in a retaliation claim under Title VII requires a plaintiff to demonstrate that the protected activity was causally connected to the adverse action. *Strothers*, 895 F.3d at 335. A causal connection exists when an employer takes a particular adverse action "*because* the plaintiff engaged in a protected activity." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (emphasis in original) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). An employee may establish prima facie causation simply by showing that: "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Strothers*, 895 F.3d at 336 (citing *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

Here, Plaintiff has pled that she engaged in protected activity at regular intervals up until her termination and that her supervisors and MVA leadership were well aware of her protected activities. *See* ECF 3, at 7 ¶ 47 (alleging that Plaintiff's managers met with other members of MVA leadership regarding her concerns and complaints). In particular, she pled that she engaged

15

in a protected activity, filing an EEOC charge, on March 24, 2023, and that she was notified of her termination on May 26, 2023. ECF 3, at 7 ¶ 50, 10 ¶ 66. Taking all inferences in favor of Plaintiff, this supports Plaintiff's assertion that she was terminated in retaliation for her protected activity. *See Carter*, 33 F.3d at 460 ("This court found a causal connection between a plaintiff's protected activity and her discharge where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed."). As such, Plaintiff has successfully stated a claim for retaliation in violation of Title VII, and count two is not dismissed. Defendant's motion to dismiss is denied with respect to count two of the corrected complaint.

### C.     Count three is dismissed.

Defendant next claims that Plaintiff's third and final count, alleging intentional infliction of emotional distress, should be dismissed because it is barred by the State of Maryland's sovereign immunity under the Eleventh Amendment, as "[t]he MVA is a unit of [MDOT], which is a principal department of State government." ECF 17-1, at 10. Plaintiff counters that the way in which the MVA is funded precludes a finding that it is entitled to sovereign immunity. ECF 18, at 19 (citing *Harris v. Motor Vehicle Admin.*, Civ. No. RDB-07-1688, 2008 WL 11509368, at *3 (D. Md. Feb. 5, 2008)). While Plaintiff's argument may be creative, it is ultimately unsuccessful, and Defendant is indeed entitled to sovereign immunity as an arm of the state.

Eleventh Amendment immunity "limits the Article III jurisdiction of the federal courts to hear cases against States and state officers acting in their official capacities." *Kitchen v. Upshaw*, 286 F.3d 179, 183 (4th Cir. 2002). "The Eleventh Amendment grants 'an unconsenting State [immunity] from suits brought in federal court by her own citizens as well as by citizens of another State.'" *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 204 (4th Cir. 2001) (quoting *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)). In considering whether an agency is an arm of the state, "the most

16

important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." *Ram Ditta v. Md. Nat. Cap. Park & Plan. Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987). Though Plaintiff argues that the MVA's funding comes from not only appropriations by the General Assembly of Maryland, but also several other sources, ECF 18, at 19–20, the ultimate reality remains that the MVA, a state agency, "receive[s] [its] budget from the Maryland General Assembly," and "the State would [] be responsible for paying any judgment awarded against . . . the MVA." *Harris*, 2008 WL 11509368, at *3 (citing Md. Code Ann., Transp. § 2-103). Thus, as Judge Bennett found in *Harris*, the MVA "is an 'arm of the state' and, therefore [is] entitled to the immunity conferred by the Eleventh Amendment." 2008 WL 11509368, at *3 (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).

The State of Maryland has waived sovereign immunity for tort claims brought against it in state court, but this waiver does not extend to claims brought against the State in federal court. *See* Md. Code Ann., State Gov't § 12-104(a)(1); *id.* § 12-103 (2) ("This subtitle does not . . . waive any right or defense of the State or its units, officials, or employees in an action in a court of the United States or any other state, including any defense that is available under the 11th Amendment to the United States Constitution"); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[A] State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts."). As such, the State of Maryland, and by extension the MVA, is entitled to sovereign immunity on count three, and it must be dismissed with prejudice.

important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." *Ram Ditta v. Md. Nat. Cap. Park & Plan. Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987). Though Plaintiff argues that the MVA's funding comes from not only appropriations by the General Assembly of Maryland, but also several other sources, ECF 18, at 19–20, the ultimate reality remains that the MVA, a state agency, "receive[s] [its] budget from the Maryland General Assembly," and "the State would [] be responsible for paying any judgment awarded against . . . the MVA." *Harris*, 2008 WL 11509368, at *3 (citing Md. Code Ann., Transp. § 2-103). Thus, as Judge Bennett found in *Harris*, the MVA "is an 'arm of the state' and, therefore [is] entitled to the immunity conferred by the Eleventh Amendment." 2008 WL 11509368, at *3 (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).

The State of Maryland has waived sovereign immunity for tort claims brought against it in state court, but this waiver does not extend to claims brought against the State in federal court. *See* Md. Code Ann., State Gov't § 12-104(a)(1); *id.* § 12-103 (2) ("This subtitle does not . . . waive any right or defense of the State or its units, officials, or employees in an action in a court of the United States or any other state, including any defense that is available under the 11th Amendment to the United States Constitution"); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[A] State's waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts."). As such, the State of Maryland, and by extension the MVA, is entitled to sovereign immunity on count three, and it must be dismissed with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, ECF 17, is **GRANTED in part and DENIED in part**. Count one of Plaintiff's corrected complaint is DISMISSED without prejudice and count three is DISMISSED with prejudice. Count two remains.

A separate implementing Order will issue.


Dated: July 1, 2024                                               /s/
                                                        Brendan A. Hurson
                                                        United States District Judge